## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 18 2020, 5:37 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Stacy R. Uliana
Bargersville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Justin F. Roebel
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Steven D. Warren, Jr.,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

June 18, 2020

Court of Appeals Case No.
19A-CR-2256

Appeal from the
Allen Superior Court

The Honorable
Wendy W. Davis, Judge

Trial Court Cause No.
02D04-1810-F2-50

**Kirsch, Judge.**

[1] Steven Warren ("Warren") appeals his convictions for possession of cocaine with intent to deal[1] as a Level 2 felony and possession of marijuana[2] as a Class B misdemeanor. Warren raises the following issues for our review:

> I. Whether the trial court abused its discretion by admitting evidence from a search conducted pursuant to a search warrant which was not supported by probable cause;
>
> II. Whether the State presented sufficient evidence that he possessed the cocaine found in the residence;
>
> III. Whether the trial court abused its discretion by denying his motion to continue; and
>
> IV. Whether the trial court abused its discretion by allowing supplemental closing arguments when the jury reached an impasse.

[2] We affirm.

## Facts and Procedural History

[3] On August 21, 2018, Detective Jamie Masters ("Detective Masters") of the Fort Wayne Police Department Vice and Narcotics division received information from a confidential informant ("CI") that the CI could purchase crack cocaine from a man named "Lil Steve." The CI provided a phone number to reach Lil

---

[1] *See* Ind. Code § 35-48-4-1.

[2] *See* Ind. Code § 35-48-4-11.

Steve. *Tr. Vol. I* at 7, 18. The CI contacted Lil Steve by phone and, as part of a controlled buy, met him near the gas station of a Meijer grocery store, entered the dark blue Audi A6, and exchanged $150 of controlled-buy money for what was later identified as crack cocaine. *Id.* at 224-32; *Tr. Vol. II* at 73-75, 88; *State's Exs.* 1-3, 76. After the transaction, the police followed the vehicle to the Dupont Hospital and observed a black male exit the vehicle. *Tr. Vol. I* at 246; *Tr. Vol. II* at 187, 218.

[4] On August 24, 2018, the CI arranged a second controlled buy for $150 worth of crack cocaine from the same seller. *Tr. Vol. I* at 239-40; *Tr. Vol. II* at 76-77. Before the second buy, the CI was shown a photo array of six individuals and was told the suspected dealer "may or may not be" pictured. The CI identified Lil Steve as Warren. *Tr. Vol. I* at 242; *Tr. Vol. II* at 77. Warren drove the same dark blue Audi A6, and the CI exchanged the controlled- buy funds for cocaine. *Tr. Vol. I* at 244-46; *Tr. Vol. II* at 78. The vehicle was registered to Barbara Hairston, Warren's grandmother. *Tr. Vol. I* at 233. Law enforcement followed the vehicle after the buy but lost sight of it in the "area of Jacobs and Edgehill" in Fort Wayne. *Id.* at 246; *Tr. Vol. II* at 170. Following the second controlled buy, officers received a warrant to obtain the geolocation information ("pings") for the phone number that the CI had contacted to arrange each controlled buy.[3] *Tr. Vol. II* at 9-10.

---

[3] The phone number the CI used to contact Warren for each controlled buy was a prepaid phone. *Tr. Vol. II* at 67-68.

[5]     On September 13, 2018, a third controlled buy occurred. Warren drove the same blue Audi. The CI entered the vehicle and exchanged the controlled buy funds for what was later determined to be crack cocaine. *Id*. at 3-5. Law enforcement noted that the phone's pings were consistent with the phone traveling from 2149 Edgehill Avenue ("Edgehill Avenue") before the transaction and after the transaction. *Id.* at 59, 80-81; *Tr. Vol. III* at 58-59. Police attempted to follow the blue Audi after the transaction but were not able to do so successfully. *Tr. Vol. II* at 5.

[6]     On October 4, 2018, a fourth controlled buy occurred for another $150 worth of crack cocaine. *Tr. Vol. II* at 8, 82. Before the transaction occurred, Fort Wayne Police Department Vice and Narcotics Detective Shane Heath ("Detective Heath") conducted surveillance at Edgehill Avenue and observed Warren exit the front door of the residence, check the mail, and return to the residence. *Id.* at 12, 172-74. Detective Heath observed the same blue Audi used in each previous controlled buy leave the garage of Edgehill Avenue approximately twelve minutes later. *Id* at 174. Officers followed the Audi as it went to a Kroger grocery store and then to the location of the controlled buy. *Id.* at 14, 126, 149.

[7]     On October 15, 2018, a search warrant was issued for Edgehill Avenue in Fort Wayne, Indiana outlining the four controlled drug buys that occurred on

August 21, 2018, August 24, 2018, September 13, 2018, and October 4, 2018.[4] *Tr. Vol. I* at 17; *Appellant's Conf. App. Vol. III* at 133-36. Warren's uncle, Rodney Chapman, leased the residence at Edgehill Avenue, and law enforcement was aware that Warren's address was 1411 East Washington Blvd through information obtained from a police database. *Tr. Vol. II* at 61; *Tr. Vol. I* at 16. On the morning of October 19, 2018, law enforcement executed the search warrant at Edgehill Avenue. *Tr. Vol. I* at 7. On that day, Warren was the sole individual in the residence, and the dark blue Audi, which was used in each controlled buy, was parked in the garage of the residence. *Tr. Vol. II* at 22-23. Warren was wearing boxer shorts and a t-shirt and appeared to be coming from the residence's master bedroom at the time of the search. *Id.* at 100.

[8] Law enforcement conducted a search of the residence. Detective Masters observed that the kitchen appeared to be the area of the residence where the process of converting powder cocaine into crack cocaine occurred. *Id*. at 24-25. Several boxes of baking soda, a blender, a razor blade with residue on it, and numerous Pyrex measuring cups, were found scattered throughout the kitchen. *Id.* at 24, 240-241; *State's Exs.* 21, 23. In a kitchen drawer law enforcement found a "larger amount of powder cocaine." *Tr. Vol. II* at 24; *State's Ex.* 24. In another kitchen drawer, law enforcement found a handgun. *Tr. Vol. II* at 27,

---

[4] The pings attributable to the phone number the CI used to arrange the controlled buys with Warren showed that 74.2% of the pings from that phone in Fort Wayne were from the Edgehill Avenue residence, and 11.9% of the phone's pings were attributable to 1411 East Washington Blvd. *Tr. Vol. III* at 66. This information was not included in the search warrant.

243.  Marijuana and digital scales were found on top of the microwave.  *Id.* at 27.  A kitchen counter drawer contained gloves, a filter mask, and baggies.  *Id.* at 242.  Detective Masters also found $283 on the counter to the left of the refrigerator and a pink substance that was later determined to contain cocaine.  *Id.* at 24-25, 235.  The scales and the microwave tested positive for cocaine residue, although there was no drug paraphernalia found in the kitchen.  *Id.* at 26, 239, 246.  Detective Masters observed that the amount of drugs found in the kitchen was "much more than a user amount."  *Id.* at 26.

[9]  In the master bedroom, law enforcement found the phone that was used to arrange the drug purchases, a second cell phone, a nine-millimeter handgun, a digital scale, and marijuana paraphernalia.  *Id* at 175-80; *Tr. Vol. III* at 67, 72-73.  The magazine of the nine-millimeter handgun had two partial latent fingerprints, and testing showed the fingerprints were consistent with Warren's fingerprints.  *Tr. Vol. II* at 247; *Tr. Vol. III* at 39, 42.  The dresser in the master bedroom contained Warren's wallet and identification, $796 in currency, and a personal check made out to Warren.  *Tr. Vol. II* at 182; *Tr. Vol. III* at 2; *State's Exs.* 46-48.  Warren's identification listed his address as 1411 E. Washington Blvd., Fort Wayne, IN.  *State's Ex.* 46.  A shoebox located near a television in the master bedroom contained a razor blade and nametag with Warren's name.  *Tr. Vol. II* at 201-02; *Tr. Vol. III* at 3; *State's Exs.* 49-51.  In the closet of the master bedroom, law enforcement uncovered a Fat Albert sweatshirt with $6,351 in the pocket.  *Tr. Vol. II* at 180; *Tr. Vol. III* at 4; *State's Exs.* 44-45.

[10]   In the second bedroom of the residence, law enforcement found a backpack with 380.3 grams of marijuana, a leather jacket with $258 in currency, and boxes for two handguns. *Tr. Vol. II* at 41-43, *Tr. Vol. III* at 5-8, 10-11; *State's Exs.* 74-75. The search of the dining room revealed additional marijuana, a grinder, rolling papers, and two rolling devices. *Tr. Vol. II* at 226-29. Law enforcement also found a shipping label that listed Warren's name and the phone number used to arrange the controlled drug buys with the CI. *Tr. Vol. II* at 282-83; *State's Ex.* 54.

[11]   The search also yielded credit union receipts dated April 20, 2018 and October 18, 2018 with the name Warren on each receipt. *Tr. Vol. II* at 31-33; *State's Exs.* 22, 29. The search uncovered other names on documents in the house, but law enforcement did not recall finding any identifying information for any other individual who may have used the residence. *Tr. Vol. III* at 177, 182.

[12]   On October 25, 2018, the State charged Warren with: Count 1, possession of cocaine with the intent to deal as a Level 2 felony; Counts 2-5, dealing in cocaine, each as a Level 4 felony; and Count 6, possession of marijuana, as a Class B misdemeanor. *Appellant's Conf. App. Vol. II* at 17-27. On February 14, 2019, Warren filed a motion to suppress the evidence found in the search of Edgehill Avenue. *Id.* at 76. The State filed its response on March 8, 2019. *Id.* at 94. On April 22, 2019, Warren filed a supplemental memorandum in support of his motion to suppress. *Id.* at 106-08. On that same day, the trial court held a hearing on Warren's motion to suppress and denied the motion. *Id.* at 9, 111. Warren then filed a motion requesting the trial court certify the

suppression order for an interlocutory appeal. The trial court denied the request on April 30, 2019. *Id.* at 109-14.

[13] On August 21, 2019, the trial court began a jury trial. *Id.* at 13. On the day of trial, Warren filed a "Motion to Dismiss, or in the Alternative, Continue Jury Trial" due to belated discovery. The motion stated that the State provided a 198-page report to him on August 12, 2019 of the phone calls between September 9, 2018 through October 9, 2018 from the phone number the CI had used to arrange the controlled drug buys with Warren, and Warren's counsel had been unable to review the call detail report. *Id.* at 122-32. After hearing argument from the parties, the trial court denied the motion and found that the prosecutor's failure to provide the report was inadvertent and that the information in the call detail report was not exculpatory. *Tr. Vol. I* at 69, 71-72, 75. The trial court also found the State would be prejudiced because the CI was in danger due to a different case unrelated to Warren and that Warren's motion "in some sort of fashion . . . is a stalling tactic" that was prejudicial to the State's case. *Id.* at 75.

[14] At trial, the trial court admitted the evidence from the search of Edgehill Avenue over Warren's objection, which restated his arguments from his motion to suppress. *Tr. Vol. II* at 21-22.

[15] At the conclusion of the trial, the jury retired to deliberate, but after nearly six hours of deliberations, the jury reported it was at an impasse on the intent element of constructive possession. The trial court ordered the parties to

provide supplemental argument on that issue. *Tr. Vol. III* at 248-49. Warren's counsel objected to providing supplemental argument, and, over the objection, the trial court allowed the prosecutor and Warren's counsel to give supplemental argument. *Id.* at 249; *Tr. Vol. IV* at 1, 3-7.

[16] Following the supplemental argument, the jury found Warren guilty of Count 1 and Count 6 and acquitted him of Counts 2 through 5. *Tr. Vol. IV* at 8-9; *Appellant's Conf. App. Vol. III* at 55-61. On September 13, 2019, Warren was sentenced on Count 1 to twenty-five years in the Department of Correction with five years suspended and four years of probation and a concurrent sentence of 180 days on Count 6. *Appellant's Conf. App. Vol. II* at 14. Warren now appeals.

## Discussion and Decision

## I. Admission of Evidence

[17] Warren first challenges the admission of evidence gathered from the search of Edgehill Avenue. Because Warren appeals from a completed trial, we review the trial court's evidentiary ruling for an abuse of discretion. *See Grayson v. State*, 52 N.E.3d 24, 26 (Ind. Ct. App. 2016). An abuse of discretion occurs only when admission of evidence is clearly against the logic and effect of the facts and circumstances, and the error affects a party's substantial rights. *Clark v. State*, 994 N.E.2d 252, 260 (Ind. 2013). We will not reweigh the evidence, and we resolve any conflicts in the evidence in favor of the trial court's ruling. *J.G. v. State*, 93 N.E.3d 1112, 1119 (Ind. Ct. App. 2018), *trans. denied*. When the challenge to the trial court's ruling is premised on a constitutional

violation, the issue is reviewed *de novo* because it raises a question of law. *Pinner v. State*, 74 N.E.3d 226, 229 (Ind. 2017).

### *Probable Cause*

[18] Warren asserts that the trial court abused its discretion when it admitted the evidence from the search, because the search warrant issued for Edgehill Avenue lacked probable cause in violation of the Fourth Amendment to the United States Constitution and was unreasonable under Article I, Section 11 of the Indiana Constitution. He maintains that the trial court's finding of probable cause is "inconsistent with this Court's holdings in *Merritt v. State*, 803 N.E.2d 257 (Ind. Ct. App. 2004) and *State v. Vance*, 119 N.E.3d 626 (Ind. Ct. App. 2019)[,]" where this court held that the affidavits were not supported by probable cause. *Appellant's Br.* at 19.

[19] In response, the State points out that a properly conducted controlled buy has "long been held to provide sufficient probable cause to search the location where the buy occurred." *Appellee's Br.* at 18-19. The State distinguishes *Merritt* and *Vance* by noting that the probable cause affidavit here indicated a stronger connection between Warren, based on his involvement in the controlled buys, and the location to be searched. In reply, Warren argues that the evidence shows "a singular and transient presence at the residence" because the affidavit did not indicate whether Warren rented, owned, or occasionally stayed at Edgehill Avenue and that it did not allege how frequently the Audi was parked at that residence or whether Warren used the address for another purpose. *Appellant's Reply Br.* at 8.

[20]    The Fourth Amendment to the United States Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

[21]    "The fundamental purpose of the Fourth Amendment is to protect the legitimate expectations of privacy that citizens possess in their persons, their homes, and their belongings." *Mullen v. State*, 55 N.E.3d 822, 827 (Ind. Ct. App. 2016) (internal quotation marks omitted). This protection has been extended to the states through the Fourteenth Amendment to the United States Constitution. *Id.* The text of Article I, Section 11 of the Indiana Constitution[5] contains nearly identical language. *State v. Spillers,* 847 N.E.2d 949, 953 (Ind. 2006).

[22]    Both the Fourth Amendment to the United States Constitution and Article I, Section 11 of the Indiana Constitution require probable cause for the issuance of a search warrant. *Smith v. State,* 982 N.E.2d 393, 404 (Ind. Ct. App.

---

[5] Article I, Section 11 similarly provides as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized.

2013), *trans. denied.* For a valid warrant to issue, the police must set forth probable cause to an issuing magistrate. *Carter v. State*, 105 N.E.3d 1121, 1127 (Ind. Ct. App. 2018), *trans. denied*. Probable cause is a "fluid concept incapable of precise definition . . . [and] is to be decided based on the facts of each case." *Figert v. State*, 686 N.E.2d 827, 830 (Ind. 1997). "[T]he central question in a probable cause determination is whether the affidavit presents facts, together with reasonable inferences, demonstrating a sufficient nexus between the suspected criminal activity and the specific place to be searched." *Carter*, 105 N.E.3d at 1128. "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of the crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983)

[23] Warren disputes that Edgehill Avenue is his residence, and citing *Merritt* and *Vance*, contends that the affidavit did not allege a sufficient connection between him and the place to be searched because the affidavit alleges only the information gathered from the October 4, 2018 controlled buy to link him to Edgehill Avenue. *Merritt* and *Vance* are distinguishable. In *Merritt,* we rejected a search warrant affidavit because it tied illegal drugs to a person who was selling them but not to the place to be searched. 803 N.E.2d at 260-61. In that case, the affidavit alleged only that "an unidentified black male" had been seen at the place to be searched with what appeared to be illegal drugs. *Id.* Without facts showing that the unidentified person with the drugs frequented, lived at, or

stored drugs at the place to be searched, there was no probable cause to believe that evidence of a crime would be found there. *Id.*

[24]  In *Vance*, a confidential informant involved in three "state-sponsored buys of cocaine" contacted an individual described by law enforcement as the "Target" who was alleged in the probable cause affidavit to be Dustin Vance ("Vance"). 119 N.E.3d at 628-29. We affirmed the trial court's grant of Vance's motion to suppress the evidence found in the residence, explaining:

> The key to the controlled buy is that the police are always in control of the situation. But the instant circumstances were not those of a previously-searched buyer entering a residence. Police did not maintain strict control in this alleged tri-level (buyer-dealer-source) transaction where the alleged middle-man, who was not searched and did not act as an agent of police, moved about on his own volition and police surveillance was interrupted. And although the cocaine ultimately produced would arguably have been "attributable to the target," *see id.*, the sole connection between Target and Vance's residence, the premises to be searched, was that Target was seen leaving the residence. Viewing someone exit a residence would not lead a reasonable person to "believe that a search of those premises will uncover evidence of a crime." *Esquerdo*, 640 N.E.2d at 1029. The search warrant, not supported by probable cause, was invalid under the Fourth Amendment.

*Id.* at 631.

[25]  Here, unlike in *Merritt* and *Vance*, the search warrant shows a stronger connection between Warren's drug dealing and Edgehill Avenue. Unlike *Vance*, there is no dispute that the controlled buys were anything other than

properly controlled buys, and the CI identified Warren after the first controlled buy, providing law enforcement with an identifiable suspect. Moreover, during each controlled buy, law enforcement maintained surveillance on the CI and, unlike *Vance*, conducted both pre-buy and post-buy searches of the CI. Unlike *Merritt* and its singular instance of drug activity, the information related to Edgehill Avenue was obtained after law enforcement had conducted three previous controlled buys. The affidavit also noted that at each controlled buy the same dark blue Audi appeared and exchanged crack cocaine for the CI's controlled buy funds. *Appellant's Conf. App. Vol. III* at 133-36.

[26]     In concluding that the affidavit was supported by probable cause despite the omission from the affidavit that Warren was not an owner or a lessee of Edgehill Avenue, the trial court found:

> I mean, it doesn't matter what Spillman says. I mean, not that I don't have faith in Spillman, but maybe he did live at [2149 Edgehill Avenue]. Maybe he's got multiple homes. Maybe he is utilizing [2149 Edgehill Avenue] just to run the drugs, and you know, there is a variety of reason[s] so I don't feel like omitting that from the affidavit was in anyway looking to - was what we categorize as omitted relevant information. I don't think that the detectives were misleading this Court.

*Tr. Vol. I* at 55-56. The totality of the evidence surrounding the four controlled buys, including (1) Warren's identification by the CI after the first controlled buy, (2) the use of the same dark blue Audi to conduct each controlled buy with the CI, which was parked in the garage on the day the warrant was executed, (3) Detective Heath's observing Warren exit the residence, check the mail and

return to the residence, and then leave from the garage in the dark blue Audi before the October 4, 2018 controlled buy, and (4) the attempt by law enforcement to track Warren after the October 4, 2018 controlled buy, show that the affidavit was not lacking in probable cause. *Appellant's Conf. App. Vol. III* at 133-36. Moreover, the time between each controlled buy also suggests an ongoing operation and that a search of Edgehill Avenue would assist law enforcement in locating contraband. The affidavit provided probable cause for the issuance of the search warrant. *See Bradley v. State*, 4 N.E.3d 831, 842 (Ind. Ct. App. 2014) (stating that "[a]lthough one particular piece of evidence may not have conclusively established probable cause, the evidence in the affidavit, when fitted together and viewed collectively, is sufficient to support the trial court's finding of probable cause under both the United States and Indiana Constitutions.") (footnote omitted).

### *Staleness*

[27] We turn next to whether the information in the warrant was stale. Warren argues that "[e]ven if there was information from which to infer a connection to Edgehill Avenue on October 4, 2018, that information was stale by the issuance and service of the warrant." *Appellant's Br.* at 22. Warren contends it is speculative that he would still be at Edgehill Avenue or that there would be evidence of cocaine dealing there on October 15, 2018, when the warrant was issued because, without a connection to Edgehill Avenue, the previous controlled buys are not sufficient to show probable cause for ongoing drug dealing. Alternatively, he maintains that probable cause had dissipated by

October 19, 2018, when the search warrant was executed, noting there was no evidence law enforcement continued surveillance or conducted any additional buys.

[28] The State argues that this case involves ongoing criminal activity, and, reiterating its arguments that there was probable cause when the warrant was issued, maintains that the warrant was not stale. The State also argues that, although not included in the probable cause affidavit, law enforcement "linked the residence to the drug dealing as the phone used to arrange the controlled buys was kept in the residence for 74.2% of the pings after phone tracking began on September 6, 2018," that officers "lost sight of the Audi near Edgehill after the second buy, and the phone's movement was consistent with the traveling from 2149 Edgehill Avenue before the third buy and returning to 2149 Edgehill Avenue after that transaction" as relevant to whether probable cause existed four days after the warrant was issued. *Appellee's Br.* at 24.

[29] In reply, Warren argues that the number of times he dealt drugs is not relevant to the question of staleness, and there remains an insufficient connection between Warren and Edgehill Avenue because Warren disputes that he resides at Edgehill Avenue. He also argues that, because the information about the phone pings was not included in the affidavit, it is irrelevant to the staleness question.

[30] The information contained in a search warrant affidavit must be timely. *Mehring v. State*, 884 N.E.2d 371, 377 (Ind. Ct. App. 2008), *trans. denied*. "The

general rule is that stale information cannot support a finding of probable cause, but rather, only gives rise to mere suspicion." *Seeley v. State*, 782 N.E.2d 1052, 1060 (Ind. Ct. App. 2003), *trans. denied*, *cert. denied* 540 U.S. 1020 (2003). Nevertheless, the exact moment information becomes stale cannot be precisely determined. *Id.* We must look to the facts and circumstances of each case to determine whether the facts and information contained in the search warrant affidavit are stale. *Mehring*, 884 N.E.2d at 377.

[31] In support of his position that the information in the probable cause affidavit from the last controlled buy on October 4, 2018 was stale when the warrant was issued on October 15, 2018, Warren cites to *Ashley v. State*, 251 Ind. 359, 241 N.E.2d 264 (Ind. 1968) and *State v. Haines*, 774 N.E.2d 984 (Ind. Ct. App. 2002). In *Ashley*, the Indiana Supreme Court held that a search warrant was defective where the affidavit on which it was based established probable cause that marijuana was at a residence on October 3, but the warrant was not issued until October 11, eight days later. 251 Ind. at 367, 241 N.E.2d at 269. In *Haines*, we found that "a crack cocaine purchase that took place two (2) to six (6) weeks prior to the probable cause hearing" to be too substantial a period of time to support a finding of probable cause that crack cocaine could be found at that residence. 774 N.E.2d at 990.

[32] Here, in contrast to both *Ashley* and *Haines*, the four controlled buys occurred over a six-week period suggesting that the operation was more ongoing than the one-time marijuana purchase in *Ashley* or the two to six-week period separating the crack cocaine purchase and the probable cause hearing as in *Haines*. The

multiple buys over the course of the investigation show the ongoing nature of drug dealing related to Warren and Edgehill Avenue. *See Bennett v. State*, 5 N.E.3d 498, 508 (Ind. Ct. App. 2014) (noting, in the case of an affidavit which "merely recites an isolated crime[,]" that the "time between the occurrence and the issuance of the warrant will likely be crucial to a determination of probable cause" but "where the affidavit or testimony recites criminal activity of a protracted or continuous nature . . . such time is of less significance." (citing *Breitweiser v. State*, 704 N.E.2d 496, 500 (Ind. Ct. App. 1999))). Moreover, as noted, the affidavit showed a sufficient link between Warren's more protracted drug dealing and Edgehill Avenue in establishing probable cause for the warrant's issuance. Under the facts and circumstances of this case, the information in the probable cause affidavit was not stale when the warrant was issued.

[33] Warren also argues that the information in the warrant was stale by the time it was executed on October 19, 2018 and cites in support *Huffines v. State*, 739 N.E.2d 1093, 1097 (Ind. Ct. App. 2000), *trans. denied*. Search warrants must be executed not more than ten days after the date of issuance. *See* Ind. Code § 35-33-5-7(b). This court has held that search warrants executed within the statutory ten-day period can be unconstitutional if the supporting probable cause dissipates before execution. *Huffines*, 739 N.E.2d at 1096-97.

[34] We acknowledge that the record does not support that there was additional investigation or reassessment of the facts supporting probable cause in the warrant in the four days after its issuance. However, we find *Huffines* to be

distinguishable as it involved only one prior drug buy from Huffines's home. Thus, under these circumstances, we cannot say that the four-day delay in the warrant's execution rendered the information in the warrant stale at the time of its execution. *See Breitweiser*, 704 N.E.2d at 501 (concluding that the initial probable cause supporting the search warrant's issuance continued to exist at the time of the search, despite the three-day delay in its execution.)

[35] Because the evidence in the affidavit was not stale and provided probable cause under both the United States and Indiana Constitutions,[6] we find no error in the trial court's admission of the evidence from the search of Edgehill Avenue. Because we conclude that the affidavit was supported by probable cause we need not address whether the good-faith exception applies.

## II.  Sufficiency of the Evidence

[36] Warren next challenges the sufficiency of the evidence that he possessed cocaine with the intent to deal. When we review the sufficiency of evidence to support a conviction, we do not reweigh the evidence or assess the credibility of the witnesses. *Lehman v. State,* 55 N.E.3d 863, 868 (Ind. Ct. App. 2016), *trans.*

---

[6] The State argues Warren waived his arguments under the Indiana Constitution regarding the search's reasonableness. Regardless of waiver, we find that the result is the same under the Indiana Constitution. Although Article I, Section 11 of the Indiana Constitution appears to have been derived from the Fourth Amendment and shares the same language, we interpret and apply it independently from Fourth Amendment jurisprudence. *State v. Bulington*, 802 N.E.2d 435, 438 (Ind. 2004). Rather than looking to federal requirements such as warrants and probable cause when evaluating Section 11 claims, we place the burden on the State to show that under the totality of the circumstances its intrusion was reasonable. *Id.* Based on the above facts, we find that the police acted reasonably, and therefore, there is no violation of the Indiana Constitution.

*denied.* We consider only the evidence most favorable to the trial court's ruling and the reasonable inferences that can be drawn from that evidence. *Lock v. State,* 971 N.E.2d 71, 74 (Ind. 2012). We also consider conflicting evidence in the light most favorable to the trial court's ruling. *Oster v. State,* 992 N.E.2d 871, 875 (Ind. Ct. App. 2013), *trans. denied.* A conviction will be affirmed if there is substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt. *Wolf v. State*, 76 N.E.3d 911, 915 (Ind. Ct. App. 2017).

[37] Warren argues the State failed to present sufficient evidence that he constructively possessed the cocaine found as a result of the search of Edgehill Avenue, contending that he did not have the intent to maintain control of the cocaine found in the kitchen. The State maintains the evidence sufficiently established that Warren had the requisite intent to maintain control of the cocaine and that his conviction should be affirmed. In reply, Warren asserts it was not apparent that the cocaine found in the kitchen was in plain view and that the State did not connect the cocaine found in the kitchen with the controlled buys.

[38] Warren limits his challenge to his conviction for possession of cocaine with intent to deliver to whether he constructively possessed the cocaine. *See* Ind. Code § 35-48-4-1; *Appellant's Conf. App. Vol. II* at 17. Possession of contraband may be either actual or constructive. *See Gee v. State*, 810 N.E.2d 338, 340 (Ind. 2004). Actual possession occurs when a person has direct physical control over the item. *Id.*

[39] There is no evidence in the record showing Warren had direct physical control over the cocaine, and Warren maintains that the State failed to present evidence that he had the requisite intent to constructively possess the cocaine. To establish constructive possession, the State must show that the defendant had both the intent and the capability to maintain dominion and control over the contraband. *Id.* Proof of a possessory interest in the premises on which the contraband is found is adequate to show the capability to maintain dominion and control over the item. *Id.* When possession of the premises is non-exclusive:

> [T]he inference of intent to maintain dominion and control over the drugs must be supported by additional circumstances pointing to the defendant's knowledge of the nature of the controlled substances and their presence. The additional circumstances have been shown by various means: (1) incriminating statements made by the defendant, (2) attempted flight or furtive gestures, (3) location of substances like drugs in settings that suggest manufacturing, (4) proximity of the contraband to the defendant, (5) location of the contraband within the defendant's plain view, and (6) the mingling of the contraband with other items owned by the defendant.

*Id*. at 341 (citation and quotation marks omitted).

[40] Warren was the sole occupant found in Edgehill Avenue at the time of the search, but Warren's possession of Edgehill Avenue was nonexclusive. His uncle, Rodney Chapman, leased the premises, and the testimony presented at trial revealed that other individuals resided or spent time at Edgehill Avenue. *Tr. Vol. I* at 16; *Tr. Vol. II* at 22-23, 61; *Tr. Vol. III* at 177, 182. Therefore, we

must determine whether Warren had the intent to maintain dominion and control over the cocaine.

[41]  Applying the factors in *Gee* to assess the intent to maintain dominion and control, the fact that the cocaine was found in the kitchen, which was the location where the powder cocaine was processed into crack cocaine, weighs in favor of the inference that Warren constructively possessed the cocaine. *Tr. Vol. II* at 24-25, 241. In the kitchen there was a pile of baking soda boxes, multiple boxes of baggies, a razor blade with residue, residue covered measuring cups, a digital scale, a microwave with cocaine residue inside, $283 in currency on the counter, and a pink substance that later was determined to contain cocaine. *Id.* at 24-25, 30-32, 234-35; *State's Exs.* 17-18, 21-23, 25-27, 55-56. The pink substance found in the kitchen that tested positive for cocaine was found on the countertop while some, including the "big chunk" of powder cocaine, was found in a drawer. *Tr. Vol. II* at 25, 235, 241; *State's Ex.* 24. Likewise, in the kitchen there were also two credit union receipts in Warren's name, one dated April 20, 2018 and the other dated October 18, 2018, suggesting that he stayed at Edgehill Avenue more frequently than as a guest. *Tr. Vol. II* at 31; *State's Exs.* 22, 29. While the receipts were not intermingled with the cocaine, they were found in the kitchen, which in light of the cocaine, baking soda, baggies, razor blade and measuring cups with residue, and digital scale, shows their proximity to a setting suggestive of drug processing. *See Gee*, 810 N.E.2d at 344 (explaining that the place where the contraband is found may serve as an additional circumstance to support the inference that a

defendant knew of the presence of the contraband and its illegal character and noting the significance of the kitchen as a gathering place.). When law enforcement executed the search warrant, Warren appeared to be coming from the master bedroom. *Tr. Vol. II* at 100. No cocaine was found in the master bedroom, although $6,351 in cash, a handgun under the bed, and a box containing Warren's identification and wallet were found. *Id.* at 175-80; *Tr. Vol. III* at 67, 72-73; *State's Exs.* 42, 44-46. Finally, the cell phone that was used to arrange the controlled buys with the CI and that had pinged to Edgehill Avenue 74% of the time over the period of September 6, 2018 through the warrant's execution was found in the master bedroom, the room where Warren appeared to be exiting from at the time the warrant was executed. *Tr. Vol. II* at 100, 178-80; *Tr. Vol. III* at 66. A reasonable trier of fact could conclude that the evidence presented was sufficient to show that Warren constructively possessed the cocaine. *See Thompson v. State*, 966 N.E.2d 112, 123 (Ind. Ct. App. 2012) (finding the evidence was sufficient to show the defendant constructively possessed the cocaine found in the residence.), *trans. denied.* Therefore, the evidence was sufficient to support Warren's conviction.

## III. Denial of Continuance

[42] Warren also contends that the trial court abused its discretion by denying his motion to continue the trial. He argues the trial court abused its discretion by finding that his motion to continue was a stalling tactic rather than a result of the State's discovery violation and that his right to present a defense outweighed the State's concerns about the CI's safety in another case. Warren

contends that he was prejudiced because the call detail report was critical to his defense of misidentification and to rebut the State's evidence from the phone ping information, which showed how often the phone was at Edgehill Avenue. The State maintains that the trial court did not abuse its discretion in denying Warren's motion to continue and that he cannot show prejudice. In reply, Warren argues the State is overlooking the discovery violation that led to his motion and that he was prejudiced.

[43] Warren does not argue that he was entitled to a continuance by statute pursuant to Indiana Code section 35-36-7-1. Rulings on non-statutory motions for continuance lie within the discretion of the trial court and will be reversed only for an abuse of that discretion and resultant prejudice. *Jackson v. State,* 758 N.E.2d 1030, 1033 (Ind. Ct. App. 2001). An abuse of discretion occurs when the decision is clearly against the logic and effect of the facts and circumstances before the trial court. *Id.* Continuances to allow additional time for preparation are generally disfavored in criminal cases. *Baxter v. State*, 522 N.E.2d 362, 366 (Ind. 1988).

[44] After hearing argument by Warren's counsel and from the State on Warren's motion to continue, the trial court denied the motion, finding the State's failure to provide the call detail report was inadvertent and that the information in the call detail report was not exculpatory. *Tr. Vol. I* at 69, 71-72, 75. It also found the State would be prejudiced if a continuance was granted, because the CI was in danger due to a different case unrelated to Warren and that Warren's motion "in some sort of fashion . . . is a stalling tactic" that was prejudicial to the

State's case. *Id.* at 75. Before the commencement of Warren's August 21, 2019 jury trial, the trial court had granted three continuances: (1) a January 21, 2019, defense motion to continue based on continuing discovery in which Warren requested to continue the jury trial; (2) a February 18, 2019, defense motion to continue due to a police officer's unavailability in which Warren requested to continue the suppression hearing and the jury trial; and (3) an April 19, 2019 motion to continue filed by the prosecutor due to a police officer's unavailability in which the prosecutor requested to continue Warren's jury trial. *Appellant's Conf. App. Vol. II* at 5-6, 9, 66, 80, 104. We acknowledge that the phone call detail report was a crucial piece of evidence and Warren is correct in citing that the preferred remedy for a discovery violation is a continuance; however, we are not convinced that the trial court abused its discretion such that Warren was prejudiced by the disclosure of the call detail report nine days before the trial. Warren was alone at Edgehill Avenue at the time of the search, and the phone was found in the master bedroom along with Warren's wallet and identification. *Tr. Vol. II* at 22-23, 100, 178-80. Warren vigorously asserted a defense of misidentification at trial, calling multiple witnesses to build his case, and it is speculation as to the impact of additional review of the call detail report on the trial. Warren has not shown that the trial court abused its discretion in denying his motion to continue the trial or that he was prejudiced by the denial.

# IV. Supplemental Argument

Finally, Warren argues that the trial court abused its discretion by allowing supplemental arguments when the jury reached an impasse. The jury deliberated for nearly six hours, and the trial court related the following interaction it had with the jury before ordering supplemental argument:

> So, I had a note from the jurors. It is 10:50 p.m. at night. The note came from my officer. The note says we have come to an agreement on Count – on one count which is Count Six, guilty. On count one through five, we currently – on count one through five we cannot currently come to an agreement. We are hung up on the intentionally and knowingly on count one. Counts two through five we are five to seven towards not guilty and getting nowhere. Then I instructed my officer, Officer Todd, to say you have all the law and evidence before [sic], please continue to work, Judge Davis. I sent that back after conferring with both Mr. Watkins and Ms. Yeager via the telephone. When I returned, I sent back my own personal handwritten note that states pursuant to the Indiana Rules I have the ability to allow the attorneys to give additional arguments on the above legal issue which the above legal issue is we are hung up on the knowingly and intentionally in count one. I said would it be helpful if I allow the attorneys to argue, and they sent back a note saying yes that would be helpful. Intentionally and knowingly possess with intent to deliver and what is constructive transfer. So with that, I am operating under rule 28 of the jury rules which states that if the jury advises the Court that it has reached an impasse in its deliberations the Court may, but only in the presence of counsel inquire the jurors to determine whether or how the Court and counsel can assist them in their deliberative process. After receiving the jurors' response, if any, which I received their response, the Court after consultation with counsel may direct further proceedings to occur if appropriate.

*Tr. Vol. III* at 248-49. Responding to a written communication from the jury implicates two protections—a common law protection and a statutory protection. *Dickenson v. State*, 835 N.E.2d 542, 550 (Ind. Ct. App. 2005) (citing *Bouye v. State,* 699 N.E.2d 620, 627 (Ind.1998)). Warren does not argue that the statutory protection is implicated and instead argues that ex parte communication occurred but limits his arguments to the common law protections under the Sixth Amendment to the United States Constitution and Indiana Jury Rule 28. The State responds that Warren waived the issue of whether the trial court's communication to the jury was an ex parte communication because he did not object on that basis and objected solely on the basis that "additional argument on constructive possession would unfairly force him to retry the case in five minutes." *Appellee's Br.* at 40. It argues that the record is ambiguous as to whether an ex parte communication occurred, and that if any error occurred in the trial court's communication with the jury, the error is harmless because the trial court did not provide substantive instruction to the jury. In reply, Warren argues that he adequately preserved the ex parte communication issue because he was never given the opportunity to object, and that the State did not rebut the presumption of harm from the trial court's communication with the jury.

[46] The Indiana Supreme Court has set forth an established procedure for the trial court to follow when the deliberating jury makes a request for additional guidance during its deliberations. *Dickenson,* 835 N.E.2d at 551-

52 (citing *Stephenson v. State,* 742 N.E.2d 463, 492 (Ind. 2001), *cert. denied,* 534 U.S. 1105 (2002)), *trans. denied.* Specifically, the trial court should:

> notify the parties so they may be present in court and informed of the court's proposed response to the jury before the judge ever communicates with the jury. When this procedure is not followed, it is an ex parte communication and such communications between the judge and the jury without informing the defendant are forbidden. However, although an ex parte communication creates a presumption of error, such presumption is rebuttable and does not constitute per se grounds for reversal. When a trial judge responds to the jury's request by denying it, any inference of prejudice is rebutted and any error deemed harmless.

*Id.* at 551 (quoting *Stephenson,* 742 N.E.2d at 492).

[47] Here, the parties dispute whether the trial court's statement shows that it communicated ex parte with the jury. It is not clear from the trial court's statement what the trial court specifically discussed on the telephone with Warren's counsel and the prosecutor. However, we agree with Warren that the trial court's statement supports the conclusion that two notes were delivered and that there is nothing in the statement to show that the second handwritten note indicating the option of having the parties provide additional argument was done in consultation with the parties. Therefore, the second note was an

ex parte communication, which created a presumption of error.[7] *See Dickenson*, 835 N.E.2d at 551. The trial court did not supplement the jury's instructions via the handwritten note; rather, the court stated that Indiana Jury Rule 28 could be used to allow the parties to provide additional argument. Therefore, the inference of prejudice was rebutted and any error resulting from the communication was harmless.

[48] We turn next to Warren's argument that it was reversible error for the trial court to order supplemental closing arguments without his consent. The State maintains that the trial court properly ordered additional argument under Indiana Jury Rule 28 over Warren's objection. Indiana Jury Rule 28 provides:

> If the jury advises the court that it has reached an impasse in its deliberations, the court may, but only in the presence of counsel, and, in a criminal case the parties, inquire of the jurors to determine whether and how the court and counsel can assist them in their deliberative process. After receiving the jurors' response, if any, the court, after consultation with counsel, may direct that further proceedings occur as appropriate.

Regarding Indiana Jury Rule 28, the Indiana Supreme Court has stated that in certain circumstances and "with advance consultation with the parties and an opportunity to voice objections" a trial court may, among a list of examples,

---

[7] We agree with Warren that he did not waive the ex parte communication issue on appeal because he did not have an opportunity to make a contemporaneous objection. *See* Ind. Trial Rule 46 ("[I]f a party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection does not thereafter prejudice him.")

"allow counsel to briefly address the jury's question in short supplemental arguments" to the jury. *Tincher v. Davidson*, 762 N.E.2d 1221, 1224 (Ind. 2002).

[49] Warren does not claim that the trial court's authority to order additional argument on the intent element of constructive possession is not authorized by Jury Rule 28, nor does he challenge whether the jury was at an impasse.[8] Instead, he cites to the concurring opinion in *Tincher* that the resolution of a jury question should require the consent of both parties. 762 N.E.2d at 1226-27. The State observes that the jury rule does not require the consent of the parties to order supplemental argument. We agree with the State. As noted, the Indiana Supreme Court has stated that the trial judge may use the procedures of Jury Rule 28 to assist the jury in its deliberations, including an opportunity for the parties to voice objections and for the use of supplemental argument. *See Tincher*, 762 N.E.2d at 1224. Warren objected to the use of supplemental argument, and, over his objection, the trial court ordered supplemental argument. We cannot say that the trial court abused its discretion in ordering the parties to provide supplemental argument. *See Parks v. State*, 921 N.E.2d 826, 831-32 (Ind. Ct. App. 2010) (concluding that the trial court did not

---

[8] Jury Rule 28 applies only when the jury is at an impasse. *See generally Ronco v. State*, 862 N.E.2d 257 (Ind. 2007). Alternatively, Indiana Code section 34-36-1-6 gives judges some discretion to assist the jury in its deliberation and in pertinent part provides that after the jury retires for deliberation, if "the jury desires to be informed as to any point of law arising in the case" that "the information required shall be given in the presence of, or after notice to, the parties or the attorneys representing the parties."

err by invoking Indiana Jury Rule 28 and that replaying testimony over defendant's objection was not an abuse of discretion resulting in prejudice.).

[50] Affirmed.

Najam, J., and Brown, J., concur.